In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-2065

CHARLES FRIEND,

*Plaintiff-Appellant,*

*v.*

CITY OF DECATUR, ILLINOIS, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:22-cv-03219 — **Eric I. Long**, *Magistrate Judge.*

ARGUED FEBRUARY 12, 2026 — DECIDED JULY 21, 2026

Before EASTERBROOK, PRYOR, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* This case arises from an alleged altercation between Charles Friend and his ex-girlfriend, Jacqueline Hathaway. Hathaway went to the hospital exhibiting confusion and bodily injuries and reported that Friend had beaten her a few days prior. Friend was arrested for domestic battery, but a jury later acquitted him. Friend then sued the arresting officers, Tyler Mahan, Cody Rose, and

Charles Lane, under 42 U.S.C. § 1983 for arresting him without probable cause and without a warrant, in violation of his rights under the Fourth Amendment; he also sued the City of Decatur under § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658, 690–91 (1978). The district court granted the defendants' motion for summary judgment, and we affirm.

## I. Background

On Friday, February 12, 2021, Officer Tyler Mahan, an officer-in-training with the Decatur Police Department, started investigating a domestic battery against Hathaway. Hathaway's adult daughter had called 911 reporting that her mother was injured; later she explained to the responding officer, Officer Michael Claypool, that her mother told her that Friend had beaten her. Hathaway herself similarly told paramedics responding to the 911 call, "[M]y boyfriend beat me up … two days ago." And Officer Claypool later relayed to Officer Mahan, who was assigned to lead the investigation, that Hathaway "got her ass beat. It looks probably a couple days old." Officer Claypool also informed Officer Mahan that Hathaway and Friend had "domestic violence reports from 2017."

Later that same day, Officer Mahan and his training officer, Officer Cody Rose, met Hathaway at the hospital, where she was being treated for injuries including forehead bruising, head swelling, a black eye, and bruises and abrasions on her arms and knees. The officers heard Hathaway tell the medical staff that her "boyfriend beat [her] face up." When Officer Mahan tried to get a statement from her, she initially recanted, stating "no one" had done anything to her and she "d[idn't] want to get anyone in trouble." But after Officer Ma-

han began asking about Friend, Hathaway explained that Friend "beat my face up," and that it happened "two days ago" around "11 or noon." Hathaway explained that she had called Friend to come over because she missed him. When he got there, Hathaway asked Friend about another woman she suspected he was seeing, and he grew angry and "started wailing at [her] because [she] wouldn't shut up about it." Hathaway said that he hit her arms and face with open hands "three or four times." She also said that she had "denied it to people for a couple days." Hathaway confirmed to Officer Mahan that she had experienced altercations with Friend in prior years.

Hathaway was not entirely consistent in her recitation of what happened. At several points, Hathaway walked back prior statements or stated she didn't want to talk about the incident, saying it was "embarrassing." And when medical staff asked what day the fight occurred, she replied "yesterday," even though she had told Officer Mahan that Friend had beaten her "two days ago." Medical staff also inquired about bruises on her legs, and Hathaway responded that they were "from black ice … nothing to do with him."

Officer Mahan spoke with Hathaway's daughter, who told him that she knew Hathaway and Friend "had a rough past" and "had altercations before" that Hathaway hadn't reported to police. The daughter did not know whether Friend had beaten her mother on this most recent occasion, but she described how two years prior, during a previous breakup, Hathaway had a bruise in "almost the exact same spot" after speaking with Friend. Initially, Hathaway told her daughter the bruise was from a fall, but she later admitted that Friend had "chucked her into a doorframe." The daughter also ex-

plained to Officer Mahan that Hathaway had recently lost her father, had not been "handling it well," had "started drinking again," and had a tendency to abuse alcohol. And though she confirmed seeing open alcohol in Hathaway's home earlier that day, the daughter did not know whether Hathaway had been drinking.

Officer Mahan left the hospital and continued his investigation by visiting Hathaway's colleague, Ken Fischer, at work. Fischer reported that he'd visited Hathaway's apartment earlier that day to return some paperwork that she'd left in his car. He stated that she let him into her apartment and was mumbling incoherently. Concerned she was experiencing a traumatic brain injury after seeing bruises on her forehead, Fischer called Hathaway's daughter to come check on her. Fischer also told Officer Mahan that on Tuesday, February 9, he'd given Hathaway a ride to work and had observed her knees "were all cut up." Hathaway told Fischer that those injuries were from a fall on black ice. Fischer also recalled Hathaway had a black eye on Tuesday, though he was not sure how she got it. As for past instances of domestic violence between Hathaway and Friend, Fischer said he'd "seen bruises on her before," but besides one that she'd explained had resulted from being pushed into a doorframe, he did not know the cause of them.

Later that day, Officer Mahan called Friend asking to meet to get a statement. Friend expressed concern that Officer Mahan would arrest him "right then and there" if he believed Hathaway. Officer Mahan assured him that if there was no reason to arrest him, "then I don't see why you couldn't meet up with me, and then we can just hash this out, get you on

your way." Friend agreed to meet and invited Officer Mahan to come to his mother's house that evening.

Officers Mahan and Rose, joined by Officer Charles Lane, went to the mother's house without a warrant. Before approaching the door, the officers discussed whether Hathaway's injuries were consistent with getting punched, particularly given Hathaway's statement to medical staff that her knee injuries were the result of falling on ice. The officers ultimately agreed that the injuries aligned with getting hit multiple times, and they suspected that Friend's hands would likely be bruised if he had in fact hit Hathaway. When Officer Mahan expressed that "[t]his one's really tough," Officer Lane said, "I would say you've got enough. Even if she's going back and forth[,] … [s]he's saying that he hit her several times. She has injuries consistent with what she's saying happened … , so you're probably good."

After conversing, the officers walked to the front door, and Officer Mahan knocked. Friend's mother opened the door saying, "Come on in." After initial pleasantries, Friend asked the officers whether Hathaway had told them she called him at 11 a.m. two days prior (Wednesday) to come to her apartment. Officer Mahan confirmed that she had, and Friend showed him his doorbell camera footage, which revealed that his car was in his driveway on Wednesday from about 11 a.m. to 5 p.m. Friend then showed his phone call logs, which suggested that Hathaway had not called him between Sunday at 10:04 p.m. and Wednesday at 8:35 p.m. Officer Mahan also looked at Friend's hands and said, "You're good."

Officers Lane and Mahan then spoke with each other inside the home, with Friend occasionally interjecting, about whether to arrest Friend. Officer Mahan conveyed hesitation,

reiterating that Hathaway had recanted some of her statements and that Friend had proven he was at home during the time she said he beat her. Officer Lane reminded Officer Mahan that he didn't have a "firm timeline," and that the incident could have occurred before or after Wednesday. Eventually, Officer Mahan arrested Friend.

Based on a sworn statement from Officer Mahan, a Macon County judge found probable cause to detain Friend until his arraignment. Friend went to trial, facing two counts of domestic battery. The jury acquitted him on both counts.

Friend filed this lawsuit against Officers Mahan, Rose, and Lane, and the City of Decatur, claiming officers violated his rights under the Fourth Amendment by arresting him without probable cause and by arresting him in his mother's home without a warrant. The defendants moved for summary judgment, and the magistrate judge, presiding by consent, granted the motion. Friend moved to alter or amend the judgment under FED. R. CIV. P. 59(e) and requested an extension of time to file a supporting memorandum of law. The magistrate judge denied Friend's request but considered the substantive arguments made in his motion and denied relief. Friend filed a Notice of Appeal as to both the summary judgment and Rule 59(e) orders, though on appeal, he challenges only the summary judgment ruling.[1]

---

[1] The defendants argue that we lack appellate jurisdiction to review the decision granting summary judgment. They insist that Friend's Rule 59(e) motion was incomplete because he did not "particularize the grounds for relief," and therefore the motion failed to toll the time to appeal, making Friend's Notice of Appeal (filed on June 24, 2025) untimely as to the summary judgment ruling (issued on March 6, 2025). *See* FED. R.

## II. Discussion

We review *de novo* the entry of summary judgment and draw all reasonable factual inferences in Friend's favor. *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022).

Friend first argues that he is entitled to a trial because officers lacked probable cause to arrest him. "The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest," *Abbott v. Sangamon County*, 705 F.3d 706, 713–14 (7th Cir. 2013), so we inquire whether any genuine disputes of fact preclude finding that, as a matter of law, the officers had probable cause to arrest Friend.

An officer has probable cause to justify an arrest if "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714. This is a "purely objective inquiry," and the belief that the arrestee had committed a crime "need only be reasonable." *Id.*

We have little difficulty finding that Officer Mahan had probable cause to arrest Friend for domestic battery. In Illinois, a person commits domestic battery if he "knowingly without legal justification by any means: (1) causes bodily

---

APP. P. 4(a)(4)(A)(iv). We disagree. "[O]nly in extreme cases where a [Rule 59(e)] motion was *completely* devoid of substance"—meaning "it did not identify a single reason" for reconsideration—will a timely-filed motion fail to toll the time to file an appeal. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014) (emphasis in original). Because Friend's motion was not "completely devoid of substance," we treat his appeal as timely. *See id.* (citation modified).

harm to any family or household member;" or "(2) makes physical contact of an insulting or provoking nature with any family or household member." 720 ILCS 5/12-3.2(a). A "family or household member" includes "persons who have *or have had* a dating … relationship." 720 ILCS 5/12-0.1 (emphasis added). Under the facts presented to Officer Mahan on the day of the arrest, a reasonable officer could have believed that Friend committed domestic battery sometime that week. Specifically, a reasonable officer would have seen, heard, or been informed of the following facts: Hathaway's injuries consistent with being beaten; Hathaway's statements to her daughter, officers, paramedics, and hospital staff that Friend had beaten her; and statements from the daughter, Fischer, and Officer Claypool that Friend and Hathaway had a history of physical altercations. These facts more than suffice to create probable cause.

In fact, Hathaway's statements on their own were sufficient to support probable cause. "Once a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect." *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006); *see also Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir. 1993) (probable cause to arrest where victim alleged arrestee hit and threatened her, and officer was aware of previous altercation between arrestee and victim).

Friend disputes Hathaway's credibility, insisting that she was too intoxicated and unreliable to be considered a "reasonably credible witness." *See Mustafa*, 442 F.3d at 548. But unreliability in Hathaway's statements, though perhaps creating reasonable doubt as to Friend's guilt, does not negate the existence of probable cause. "[P]olice officers are constantly

faced with reluctant witnesses, recanted confessions, and witness identifications replete with inconsistencies, but the weighing of evidence is for the judge and jury." *Moorer v. City of Chicago*, 92 F.4th 715, 722 (7th Cir. 2024) (citation omitted); *see Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023) (per curiam) ("An officer need not even believe that a witness is reliable to determine that her statement supports probable cause for an arrest because the assessment of credibility rests with courts, not officers." (citation omitted)). This is particularly true for victims of domestic abuse, who often recant statements made about their abusers. *See United States v. Young*, 316 F.3d 649, 654 (7th Cir. 2002) ("As is not entirely uncommon with victims of domestic abuse, she denied most of the allegations against [the defendant] and recanted her story about the kidnap[p]ing and abuse."). Hathaway also provided reasonable explanations for her recantations and inconsistent statements. She told Officer Mahan that she didn't want to talk about the beating because it was "embarrassing"; that she didn't want to "incriminate" anyone; and that she'd initially lied to people about the cause of her injuries (i.e., a fall on black ice).[2] All told, "even if questionable," Hathaway's allegations "were enough to give defendants probable cause to arrest." *See Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019).

Friend also points out that Officer Mahan made a sworn statement following the arrest that a record check revealed Friend had no criminal history. But our "inquiry is limited to what the officer knew at the time of the arrest and not what

---

[2] Another reasonable possibility, which the officers discussed before arresting Friend, was that only Hathaway's leg injuries were from the fall, while her facial and arm injuries were from Friend.

has been gained from hindsight." *Johnson*, 53 F.4th at 1068 (quoting *Harney v. City of Chicago*, 702 F.3d 916, 922 (7th Cir. 2012)). And in any event, that Friend had no prior *convictions* does not mean that no prior *reports* of violence had been made—the record shows that Officer Mahan was told before the arrest that there were documented domestic violence reports involving Friend and Hathaway. Further, apart from the existence of any prior police reports, there were still credible statements from Hathaway, her daughter, and Fischer detailing the couple's history of physical altercations.

Finally, Friend insists that any probable cause dissipated as the investigation continued, particularly after officers spoke to Fischer and Friend. But the officers did not learn of any facts after leaving the hospital that made it less likely that Friend had beaten Hathaway sometime that week. True, the camera footage made it less likely that the incident happened at the specific time Hathaway claimed. But nothing about Friend's statements ruled out the possibility that the altercation occurred at a different time or on a different day. Hathaway was disoriented when speaking to officers about the timing of the events. A reasonable officer could have thought that, while mistaking the timing of the incident, Hathaway nevertheless conveyed the truth that the incident had occurred. And Fischer's statements further expanded the possible timeline of the beating—he recalled seeing a black eye on Hathaway as early as Tuesday. Though Fischer relayed that at least some of Hathaway's injuries were reportedly from falling on ice, "[t]he fact that an innocent explanation may be consistent with the facts alleged … does not negate probable cause." *United States v. Klump*, 536 F.3d 113, 120 (2d Cir. 2008) (citing *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985)).

Friend next argues that he is entitled to a trial because officers arrested him in his mother's home without a warrant and without consent to entry. It is undisputed that the officers did not have a warrant when they arrested Friend inside his mother's home. And a warrantless arrest in the home is normally a violation of the Fourth Amendment. *Milbeck v. George*, 171 F.4th 930, 936 (7th Cir. 2026) (per curiam) (citation omitted). A notable exception, though, is when the homeowner or arrestee consents to the warrantless entry. *Id*. Here, the officers relied on Friend's and his mother's consent to meet at and enter the house: Friend invited Officer Mahan to meet him at his mother's house, and Friend's mother welcomed the officers in when they arrived. The arrest, supported by probable cause as discussed above, was thus proper even in the absence of a warrant.

Relying on *Hadley v. Williams*, 368 F.3d 747 (7th Cir. 2004), Friend argues that Officer Mahan's statement earlier that day that the two would just "hash this out, get you on your way" was a promise—and a lie—that the officers would not arrest him, and he says that this lie negated his (and his mother's) consent. But Friend's reliance on *Hadley* is misplaced. There, we found that the officer's "outright and material lie" made to an arrestee's mother—stating the officers had a warrant to arrest her son when they did not—vitiated the mother's consent to enter her home. *Id.* at 749–50. We explained that although "the law permits the police to pressure and cajole, conceal material facts, and actively mislead, it draws the line at outright fraud, as where police extract a confession in exchange for a false promise to set the defendant free." *Id.* at 749 (citing *United States v. Rutledge*, 900 F.2d 1127, 1129–31 (7th Cir. 1990)). Officer Mahan's statement was neither an outright nor a material lie. He spoke in conditional terms: *if* Friend had

not beaten Hathaway, *then* the officers could get him on his way. Friend cannot demonstrate that anything about this statement is outright false. At all times, Friend's and his mother's consent was knowing and voluntary. *See United States v. Villalpando*, 588 F.3d 1124, 1128–29 (7th Cir. 2009) (finding officer did not make false promise of leniency when she stated she would "go to bat" for the defendant to "work this out," and said "we don't have to charge you").

With no underlying constitutional violation, Friend's *Monell* claims against the City also fail. *See Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010).

\* \* \*

For the foregoing reasons, we affirm.